9TH Circuit Docket No. 13-15077

USDC Case No. 3:12-cv-00316-RCJ-VPC
Nevada (Reno)

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

| | |
|---|---|
| NATIONAL COUNCIL OF LA RAZA; LAS VEGAS BRANCH OF THE NAACP, Branch 1111; RENO-SPARKS BRANCH OF THE NAACP, Branch 1112,<br><br>　　　　Plaintiffs-Appellants,<br><br>　　v.<br><br>ROSS MILLER, in his official capacity as Secretary of State of the State of Nevada; MICHAEL WILLDEN, in his official capacity as Director of the Department of Health and Human Services of the State of Nevada,<br><br>　　　　Defendants-Appellees, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

On Appeal From the United States District Court

For the District of Nevada

## APPELLEES' ANSWERING BRIEF

CATHERINE CORTEZ MASTO
Attorney General
KEVIN BENSON
Senior Deputy Attorney General
Nevada State Bar No. 9970
100 North Carson Street
Carson City, Nevada 89701-4717
(775) 684-1114
kbenson@ag.nv.gov
*Attorneys for Defendants-Appellees*
ROSS MILLER, Secretary of State, and MICHAEL WILLDEN, Director of the Department of Health and Human Service

## **TABLE OF CONTENTS**

I.     STATEMENT OF THE ISSUES ......................................................1

II.    STATEMENT OF THE CASE .......................................................2

III.   STATEMENT OF THE FACTS ......................................................3

IV.    SUMMARY OF THE ARGUMENT ..................................................3

V.     ARGUMENT..............................................................................5

    I.     Legal Standard for Standing..............................................5

    II.    The Plaintiffs All Lack Article III Standing .........................7

        A.     The District Court correctly found that none of the
              Plaintiffs have Organizational Standing ......................7

        B.     The District Court correctly found that all of the
              Plaintiffs lack Associational Standing .......................12

            1.  Plaintiffs must identify by name a member who
                would have standing to sue in his or her own right .................13

            2.  Requesting prospective relief does not excuse a plaintiff
                from identifying a member who would have standing.............14

            3.  The Supreme Court has rejected any theory of
                "probabilistic standing." ...........................................16

            4.  None of the Plaintiffs adequately alleged
                associational standing ...............................................21

    III.   The District Court Correctly Dismissed the Complaint for
        Failure to Comply with the NVRA's Notice Requirements ...................23

        A.     The notice requirement of the NVRA is not an affirmative
              defense, therefore the District Court did not abuse its
              discretion by dismissing for lack of notice ...................23

        B.     Alleging a "continuing violation" is not sufficient to
              dispense with the NVRA's notice requirements...........................28

            1.  The plain language of the NVRA requires
                identification of a particular violation within 120
                days of a federal election ..........................................31

            2.  The allegations in this case do not plausibly show
                that a violation occurred within 120 or 30 days
                of a federal election..................................................36

            3.  The existence of a policy that allegedly violates the
                NVRA does not excuse failure to comply with
                the notice requirements ............................................43

VI.    THE DISTRICT COURT CORRECTLY DISMISSED THE
       COMPLAINT WITH PREJUDICE ................................................... 46

VII.   REASSIGNMENT IS NOT PROPER ............................................... 47

       A.    There is no evidence of personal bias ..................................... 48

       B.    No "unusual circumstances" exist warranting reassignment ................... 53

VIII.  CONCLUSION ........................................................................ 57

STATEMENT OF RELATED CASES ....................................................... 58

CERTIFICATE OF COMPLIANCE ......................................................... 59

CERTIFICATE OF SERVICE .............................................................. 60

# TABLE OF AUTHORITIES

## CASES

*Air-Sea Forwarders, Inc. v. Air Asia Co., Ltd.*,
880 F.2d 176, 191 (9th Cir. 1989)...................................................... 47,56

*Alabama ex rel. Patterson*,
357 U.S. 449, 459 (1958)....................................................................21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................ 36,37,40,41,42

*Associated General Contractors of America, San Diego Chapter, Inc. v. California Dept. of Transp.*,
713 F.3d 1187, 1194 ................................................................. 12,14,19

*Association of Community Organizations for Reform Now v. Fowler*,
178 F.3d 350, 360-61 ...........................................................................9,10

*Association of Community Organizations for Reform Now v. Miller*,
129 F.3d 833, 838 (6th Cir. 1997) ..................................... 27,29,33,34,35

*Barnum Timber Co. v. EPA*,
633 F.3d 894, 905 n. 3 (9th Cir.2011) ....................................................5

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................. 36,37,40,42

*Broyles v. Texas*,
618 F.Supp.2d 661, 691-92 (S.D.Tex. 2009)................................ 25,26,27,28,29,47

*Century Aluminum Co. Securities Litigation*,
--- F.3d ----, 2013 WL 1633094 (9th Cir. 2013)......................... 36, 40,41

*Chamber of Commerce of U.S. v. E.P.A.*,
642 F.3d 192, 199 (D.C. Cir. 2011)......................................................13

*City of Los Angeles v. County of Kern*,
581 F.3d 841, 845 (9th Cir. 2009).........................................................6

*Durning v. Citibank, N.A.*,
950 F.2d 1419, 1424 n. 2 (9th Cir.1991) ................................................................16

*Evon v. Law Offices of Sidney Mickell*,
688 F.3d 1015, 1034 (9th Cir. 2012)..................................................................52

*Fair Housing Council of San Fernando Valley v. Roommate.com, LLC*,
666 F.3d 1216, 1224 (9th Cir. ,2012) ........................................ 10,11,12

*Florida State Conference of NAACP v. Browning*,
522 F.3d 1153, 1160 (11th Cir.2008) .................................... 15,16,17,18

*Foman v. Davis*,
371 U.S. 178, 182 (1962).....................................................................46

*Fund Democracy, LLC v. S.E.C.*,
278 F.3d 21, 25 (D.C. Cir. 2002)........................................................23

*FW/PBS, Inc. v. Dallas*,
493 U.S. 215, 235 (1990).....................................................................13

*Georgia State Conference of N.A.A.C.P. v. Kemp*,
841 F.Supp.2d 1320, 1335 (N.D.Ga. 2012)................................. 25,26,27,28,34,47

*Glen Holly Entertainment, Inc. v. Tektronix, Inc.*,
352 F.3d 367, 382 (9th Cir. 2003).....................................................56

*Hallstrom v. Tillamook County*,
493 U.S. 20, 31 (1989).........................................................................27

*Harkless v. Brunner*
545 F.3d 445, 447 (6th Cir. 2008).........................................................9

*Havens Realty Corp. v. Coleman*,
455 U.S. 363, 378-79 (1982) .................................................... 6, 7 11

*Int'l. Ass'n of Machinists v. BF Goodrich*,
387 F.3d 1046, 1057 (9th Cir. 2004) ..................................................33

v

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
624 F.3d 1083, 1088 (9th Cir. 2010)..................................................................7

*Leadsinger, Inc. v. BMG Music Pub.*,
512 F.3d 522, 532 (9th Cir. 2008)...............................................................46

*Leeson v. Transamerica Disability Income Plan*,
671 F.3d 969, 976 (9th Cir. 2012) .................................................................6

*Lujan v. Defenders of Wildlife*,
504 U.S. 555, 560-61 (1992) ...........................................................6,7,11,20

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
519 F.3d 1025, 1034 (9th Cir. 2008)...........................................................46

*Marley v. U.S.*,
567 F.3d 1030, 1038 (9th Cir. 2009).............................................................15

*Matter of Yagman*,
796 F.2d 1165, 1182 (9th Cir. 1986)..................................................48,49,53

*Maya v. Centex Corp.*,
658 F.3d 1060, 1067 (9th Cir. 2011)...........................................................23

*Mitchell v. Maynard*,
80 F.3d 1433, 1449 (10th Cir. 1996) ...........................................................52

*Omar v. Sea-Land Service, Inc.*,
813 F.2d 986, 991 (9th Cir. 1987)................................................................24

*Payan v. Aramark Management Services Ltd. Partnership*,
495 F.3d 1119, 1122-23 (9th Cir. 2007) ....................................................25

*Perez v. Nidek Co., Ltd.*,
711 F.3d 1109, 1113 (9th Cir. 2013)...........................................................37

*R&D Latex Corp.*,
242 F.3d at 1118.........................................................................................48

*Sandusky County Democratic Party v. Blackwell*,
387 F.3d 565, 574 (6th Cir. 2004)....................................................1718,19

vi

*Sierra Forest Legacy v. Sherman*,
646 F.3d 1161, 1176–77 (9th Cir.2011) ................................................5

*Starr v. Baca*,
652 F.3d 1202, 1212, 1216 (9th Cir. 2011) ........................................42

*Summers v. Earth Island Institute*,
555 U.S. 488, 498 (2009)................................................ 4,13,17,18,20,23

*Taylor v. Regents of Univ. of Cal.*,
993 F.2d 710, 712 (9th Cir.1993) ..................................................... 48,51

*Thinket Ink Information Resources, Inc. v. Sun Microsystems, Inc.*,
368 F.3d 1053, 1061 (9th Cir. 2004).....................................................46

*Thompson v. Runnels*,
705 F.3d 1089, 1099 (9th Cir. 2013) ............................................... 25, 28

*U.S. v. Esquivel*,
88 F.3d 722, 726-27 (9th Cir. 1996) ....................................................38

*U.S. v. Mancinas-Flores*,
588 F.3d 677, 686 (9th Cir. 2009).........................................................48

*U.S. v. McTiernan*,
695 F.3d 882, 891 (9th Cir. 2012).........................................................48

*U.S. v. Sears, Roebuck & Co., Inc.*,
785 F.2d 777, 780 (9th Cir. 1986)........................................ 47,53,54,55,56

*United Nat. Ins. Co. v. R&D Latex Corp.*,
242 F.3d 1102, 1118 (9th Cir. 2001).....................................................47

*United States v. Cabaccang*,
332 F.3d 622, 627 (9th Cir.2003) .........................................................33

*United States v. Conforte*,
624 F.2d 869, 881 (9th Cir. 1980) ........................................................48

*Valdez v. Squier*,
676 F.3d 935, 947 (10th Cir. 2012) ......................................................44

*Vaughn v. Bay Environmental Mgmt. Inc.*,
567 F.3d 1051, 1024 (9th Cir. 2009) ............................................................6

*Veterans for Common Sense v. Shinseki*,
678 F.3d 1013, 1037 (9th Cir. 2012) ...........................................................15

*Warth v. Seldin*,
422 U.S. 490, 515-16 (1975) .......................................................................14

*Weight Watchers Intern., Inc. v. F.T.C.*,
47 F.3d 990, 992 (9th Cir. 1995) .................................................................23

*Wood v. Milyard*,
132 S.Ct. 1826 (2012) ......................................................................24,25,28

## **OTHER**

28 U.S.C. § 455      ......................................................................................48
42 U.S.C. § 1973gg-9(b).......................................................................26,30,31
42 U.S.C. § 1973gg-9(b)(2)...................................................................28,31,35
42 U.S.C. § 1973gg-9(b)(3) .......................................................................30
42 U.S.C. § 1973gg-5(a)(6)(A)...................................................................43
42 U.S.C. § 1973gg-5(a)(6)(B)(i) ...............................................................43
42 U.S.C. § 1973gg-5(a)(6)(B)(iii)........................................................43,44,45
Prisoner Litigation Reform Act ....................................................................27
Resource Conservation and Recovery Act ..................................................27
Section 11 of the Securities Act of 1933 ....................................................40

The Defendants-Appellees, Ross Miller, Nevada Secretary of State, and Michael Willden, Director of the Department of Health and Human Services, by and through their counsel, Catherine Cortez Masto, Attorney General, and Kevin Benson, Senior Deputy Attorney General, hereby submit their Answering Brief.

## I.

## STATEMENT OF THE ISSUES

1.     Did the District Court correctly dismiss the Complaint for lack of Article III standing where all of the plaintiffs are organizations and none of them identified concrete, actual harm, nor identified an individual member whose rights under the National Voter Registration Act ("NVRA") were allegedly violated?

2.     Did the District Court correctly dismiss the Complaint for lack of statutory standing where the Plaintiffs failed to comply with the NVRA's mandatory notice and time-to-cure requirements?

3.     Do the facts that the District Court ruled against the Plaintiffs, and questioned why they waited more than six months from the time of the alleged violations of the NVRA to file the Complaint, demonstrate that this case is one of the "exceedingly rare" circumstances where reassignment upon remand is proper?

////

////

////

1

## II.

## STATEMENT OF THE CASE

Appellants in this case were the plaintiffs below: the National Council of La Raza ("La Raza"), the Las Vegas Branch of the NAACP ("Las Vegas NAACP") and the Reno-Sparks Branch of the NAACP ("Reno NAACP"). Collectively they are referred to as "Plaintiffs" in this brief.

Respondents were the defendants below: Ross Miller, in his official capacity as Nevada's Secretary of State, and Michael Willden, in his official capacity as the Director of the Department of Health and Human Services. Collectively, "Defendants" or "Nevada."

The Plaintiffs' statement of the case contains numerous assertions of fact which are not part of the procedural history of this case and which Miller and Willden contest. However, because this case was decided on a motion to dismiss, it would not be appropriate to attempt to set the facts straight at this point in the litigation. For purposes of this appeal however, the Court should ignore "facts" asserted in the statement of the case that do not relate to procedural history and are without citation to or support in the record.

////

////

////

## III.

## STATEMENT OF THE FACTS

Miller and Willden deny many of the facts set forth in Plaintiffs' brief, but because this case was decided on a motion to dismiss, the facts alleged in the Complaint are taken as true.

## IV.

## SUMMARY OF THE ARGUMENT

The Complaint was properly dismissed because Plaintiffs all lack Article III standing. Because all of the Plaintiffs are organizations, and not individuals whose rights under the NVRA can be directly affected, they bear the burden of showing that they have either organizational standing to sue for damage done to the organizations themselves, or associational standing to sue on behalf of their members.

Generally speaking, an organization can show an actual injury if it has had to divert its resources from its usual activities in carrying out its mission to instead combatting the defendant's challenged conduct. Here, Plaintiffs lack organizational standing because their own allegations showed that they have not "diverted" any resources to combat the alleged violations of the NVRA. Instead, Plaintiffs' allegations demonstrate that they have, and will continue to, conduct voter registration drives targeting low-income citizens, regardless of any

compliance or non-compliance with the NVRA, because this is part of their missions. Using resources to advance the organization's mission is not a "diversion" of resources necessary to show an actual injury for Article III standing.

To have associational standing, an organization must establish that: (1) it has members who would have standing to sue in their own capacities, (2) the lawsuit is germane to the organization's purpose; and, (3) must seek relief that does not require the participation of individual members. Plaintiffs lack associational standing because they have failed to identify any members who would have standing to sue in their own right, as required by *Summers v. Earth Island Institute*, 555 U.S. 488, 498 (2009).

The District Court correctly dismissed the Complaint on the independent basis that Plaintiffs lack statutory standing because they failed to comply with the NVRA's mandatory notice requirements. The NVRA permits a private suit only if violations are not cured within 90 days, if the violation occurred more than 120 days before a federal election. If the violation occurred less than 120 days, but more than 30 days, before a federal election, the defendant is entitled to 20 days to cure the violation before an action may be brought.

Plaintiffs failed to give notice of any violation that occurred less than 120 days before a federal election, therefore the Plaintiffs lacked standing when they brought their complaint only 31 days after the date of their Notice Letter.

4

Plaintiffs' assertions that the violations were "on-going" or "continuous," coupled with their failure to identify any particular violation within 120 days of a federal election, are not sufficient to confer statutory standing. Since proper notice is a necessary element of statutory standing under the NVRA, this is not an issue that was or could be waived by the Defendants.

Finally, should there be a remand in this case, reassignment to a different judge is inappropriate. The District Court attempted as best it could to accommodate an early hearing date in this case, considering the motion for preliminary injunction was filed more than six months after the alleged violations occurred. The facts that the District Court commented on this delay, or declined to grant all of Plaintiffs' eight *pro hac vice* motions, or that it ultimately ruled against the Plaintiffs, do not constitute adequate grounds for the extraordinary action of ordering reassignment.

## V.

## ARGUMENT

## I.     LEGAL STANDARDS FOR STANDING.

This Court reviews whether plaintiffs have standing *de novo*. *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1176–77 (9th Cir.2011); *Barnum Timber Co. v. EPA*, 633 F.3d 894, 905 n. 3 (9th Cir.2011). Article III standing is jurisdictional, and can neither be waived by a party, nor ignored by the court. *City of Los Angeles*

5

*v. County of Kern*, 581 F.3d 841, 845 (9th Cir. 2009). This Court must independently satisfy itself that the plaintiff has standing. *Id.*

To have Article III standing, an organization must meet the same test as an individual. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982). The "irreducible constitutional minimum of standing" requires that the plaintiff show: (1) an "injury in fact" that is "concrete and particularized;" (2) that is fairly traceable to the challenged action of the defendant; and, (3) that will likely be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

To bring an action under a federal statute, a plaintiff must not only have Article III standing, but also statutory standing. *See Leeson v. Transamerica Disability Income Plan*, 671 F.3d 969, 976 (9th Cir. 2012); *see also Vaughn v. Bay Environmental Mgmt. Inc.*, 567 F.3d 1051, 1024 (9th Cir. 2009). A dismissal under Rule 12(b)(6) for failure to state a claim is proper when the statute imposes "nonjurisdictional limitations on causes of actions" with which the plaintiff has not complied. *Leeson*, 671 F.3d at 976, 971.

////

////

////

////

6

## II.  THE PLAINTIFFS ALL LACK ARTICLE III STANDING.

### A.  The District Court correctly found that none of the Plaintiffs have organizational standing.

An organization may bring an action on its own behalf if it has suffered a legally redressable injury in its own right.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-379 (1982).  It must meet the same constitutional requirements for standing as an individual.  *Id.*  These are: "(1) injury in fact; (2) causation; and (3) redressability."  *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) ("*ATLF*").

Obviously, the Plaintiffs in this case are not individuals who can vote, and therefore cannot be directly aggrieved by Defendants' alleged failure to provide voter registration forms to public assistance clients pursuant to the NVRA.  Instead, they must show that Defendants' actions caused them to divert resources such that their ability to carry out their missions was frustrated.  *Id.*  "An organization may sue only if it was forced to choose between suffering an injury and diverting resources to counteract the injury."  *Id.* at 1088, n. 4.

As the Supreme Court has recognized, when the plaintiff is himself the object of the alleged violation, there is usually little doubt that he has suffered harm as a result.  *Lujan*, 504 U.S. at 561-62.  "When, however, as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful

7

regulation (or lack of regulation) of *someone else*, much more is needed." *Id.* at 562.

In this case, the District Court correctly found that the Plaintiffs lacked organizational standing because the alleged "harm" – using resources to run voter registration drives targeted at low income and minority citizens – is exactly the same activity they describe engaging in as a core part of their missions. *See* EOR 22-24.

Specifically, La Raza asserted that it "has committed and continues to commit time and personnel to conducting voter registration drives in the State of Nevada." EOR 60. It also alleges that it "regularly has conducted and continues to conduct voter registration drives in Nevada (including, for example, registering over 21,500 voters in the State of Nevada since 2008)." EOR 60. La Raza primarily conducts voter registration drives in two ways: first, at music festivals, sporting events, or other times where large crowds of people congregate; and, second, by going door-to-door, especially in low-income neighborhoods. EOR 60-61.

Similarly, the NAACP Plaintiffs asserted that they "organize and conduct numerous voter registration drives in Nevada (including, for example, conducting approximately four or five major and ten to twelve smaller voter registration drives in Nevada in the last three years)." EOR 62. They also allege that they "devote[]

8

substantial resources to voter registration drives **every year**, including recent and present efforts registering voters at grocery stores, parks, and libraries in low-income neighborhoods." EOR 62 (emphasis added).

The District Court recognized that each of the Plaintiffs generally alleged that "but for" the Defendants' alleged failure to comply with the NVRA, they would not have "diverted" resources to voter registration drives aimed at low-income citizens. EOR 22, 23. But the District Court correctly perceived that this conclusory allegation of diversion was directly contradicted by the Plaintiffs' other allegations. *Id.* The fact that the Plaintiffs conduct "numerous" voter registration drives aimed at low-income citizens every year, have done so for years prior to filing suit, and that such drives were part of each Plaintiff's stated mission, showed that by their "own declarations, they were doing business as usual; whether Nevada was in compliance or not." EOR 24.

The District Court found this case distinguishable from *Association of Community Organizations for Reform Now v. Fowler*, 178 F.3d 350, 360-61 (5th Cir. 1999). In *Fowler*, the Fifth Circuit found that ACORN had standing because ACORN submitted evidence that it had conducted at least one voter registration drive at "welfare waiting rooms, unemployment offices, and on Food Stamp lines." *Id.* at 361. Similarly, in *Harkless v. Brunner*, 545 F.3d 445, 447

(6th Cir. 2008), the plaintiffs conducted voter registration drives specifically at public aid offices.

By contrast, in this case, the District Court observed that the Plaintiffs have not alleged that any of their voter registration activities were conducted at public assistance offices. EOR 22. Instead, the Plaintiffs' allegations showed that they conducted voter registration drives generally, as part of their normal operations, and there were no facts alleged that would indicate that they did this in response to, or in order to combat, Nevada's alleged failure to comply with the NVRA. Thus, the District Court held that, unlike the plaintiffs in *Fowler*, the Plaintiffs here did not adequately allege harm that was causally connected to the Defendants' alleged conduct.[1] EOR 22.

Furthermore, this is the type of case that Judge Ikuta warned about in her concurring and dissenting opinion in *Fair Housing Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1224 (9th Cir. ,2012). Judge Ikuta pointed out that "these organizations were 'injured' for standing purposes by the very expenses that advanced their mission. *Id.* This raises a question that

---

[1] *Georgia State Conference of N.A.A.C.P. v. Kemp*, 841 F.Supp.2d 1320 (N.D.Ga. 2012) is also distinguishable. There, the court held that the plaintiffs had standing, even though they made only conclusory allegations of diversion of resources. *Id.* at 1336-37. However, it does not appear that, like in this case, there were also allegations that conflicted with such assertions. *See id.*

threatens to bring us loggerheads with *Lujan*: How can an organization have a legally protected interest in *not* spending money to advance its core mission?" *Id.*

The majority in *Roommate.com* found that the plaintiffs had standing because they investigated the defendant's practices and started "new education and outreach campaigns targeted at discriminatory roommate advertising." *Id.* at 1219. But Judge Ikuta was rightly skeptical that this was truly a "diversion" of resources, concluding instead that it was simply a voluntary choice about how best to advance the organization's mission in light of ever-evolving technology. *Id.* at 1226-27. As she pointed out: "New organizational undertakings by definition divert resources but… nothing about such diversion is per se harmful." *Id.* at 1226.

Obviously, Judge Ikuta's opinion in *Roommate.com* is not controlling circuit precedent. However, it does point out that *Lujan* and other Supreme Court authority <u>is</u> controlling, and those cases clearly requires that the plaintiff organization must truly "divert" resources *away* from carrying on its mission. *See e.g. Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (racial steering practices in housing palpably interfered with organization's mission of providing counseling and referral services). It is only upon a showing of significant diversion of resources, which therefore *interferes with* the organization's ability to carry out its mission that constitutes the necessary concrete and actual harm necessary for Article III organizational standing. *See id*, n. 21. As Judge Ikuta

11

points out, spending money *to advance* the organization's mission is exactly what we expect such organizations to do, and does not constitute harm.

Finally, unlike the plaintiffs in *Roommate.com*, here the Plaintiffs have not shown that they have done anything new or different from what they have done in the past. Instead, their own statements indicate that they already devoted substantial resources to voter registration drives aimed at low-income citizens, and that they intend to continue doing so because that is consistent with their missions. Accordingly, the District Court correctly dismissed the Complaint because the Plaintiffs have not met the first requirement of organizational standing: that they have suffered a concrete, actual injury.

### B.  THE DISTRICT COURT CORRECTLY FOUND THAT ALL THE PLAINTIFFS LACK ASSOCIATIONAL STANDING

To have associational standing, an organization must meet three criteria: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and, (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Associated General Contractors of America, San Diego Chapter, Inc. v. California Dept. of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013).

////

12

1.  <u>Plaintiffs must identify by name a member who would have standing to sue in his or her own right.</u>

To meet the first requirement, the plaintiff must show that it has at least one member who has suffered an "injury in fact" that is traceable to the defendant. *Id.* This requires "specific allegations establishing that at least one *identified member* had suffered or would suffer harm." *Summers v. Earth Island Institute*, 555 U.S. 488, 498 (2009) (emphasis added). It is insufficient to merely allege that, due to the size of membership, it is statistically probable that some unidentified member has or will be harmed. *Id.* The Court also noted that in a previous case, *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 235 (1990), it held that an affidavit offered to show standing would be insufficient "because it did not *name* the individuals who were harmed by the challenged license-revocation program." *Id.* (emphasis added).

Contrary to Plaintiffs' argument, Opening Brief, p. 22, n. 11, *Summers* is directly applicable to this case. Just the fact that Plaintiffs allegedly "have members who are and/or will be recipients of public assistance in Nevada" is not sufficient for associational standing. *See id.* As the Court in *Summers* made clear, the organization's obligation is to actually identify such a member who would have standing. *Summers*, 555 U.S. at 498; s*ee also Chamber of Commerce of U.S. v. E.P.A.*, 642 F.3d 192, 199 (D.C. Cir. 2011) ("When a petitioner claims associational standing, it is not enough to aver that unidentified members have

13

been injured…   Rather, the petitioner must specifically "identify members who have suffered the requisite harm.").

2. <u>Requesting prospective relief does not excuse a plaintiff from identifying a member who would have standing.</u>

Plaintiffs argue that they are not required to "name names" of individual members who would have standing because they are seeking prospective relief. Opening Brief, p. 23.  However, this argument confuses the first requirement for associational standing (that its members would have standing individually) with the third (that individual participation is not necessary).  *See Associated General Contractors*, 713 F.3d at 1194.

Seeking declaratory or prospective injunctive relief is generally a prerequisite to satisfying the *third* requirement, because associational standing is not permissible where it is necessary to have individual members participate. *Warth v. Seldin*, 422 U.S. 490, 515-16 (1975) (rejecting associational standing where the claim was for damages, and would necessarily require "individualized proof" of the fact and extent of damages for each member).

Thus, seeking prospective relief is only *one* of the requirements for associational standing.  It is not, by itself, the sole test of whether associational standing is proper.  Even though they seek prospective injunctive relief in this case, Plaintiffs have still failed to meet the first requirement for associational standing:

14

showing that any of their individual members would have standing in their own right.

To support their standing argument, Plaintiffs cite *Veterans for Common Sense v. Shinseki*, 644 F.3d 845, 862 n.16 (9th Cir. 2011). In *Veterans*, in a footnote, the court stated: "In a suit for prospective relief, that potential for immediate harm is sufficient to establish organizational standing." *Id.* It then quoted an Eleventh Circuit case in a parenthetical that when prospective relief is requested, that circuit has not required the plaintiff organizations to "name names." *Id.* (quoting *Florida State Conference of NAACP v. Browning*, 522 F.3d 1153, 1160 (11th Cir.2008)).

However, the panel decision in *Veterans* was not merely reversed by the en banc court, but was vacated. *Veterans for Common Sense v. Shinseki*, 678 F.3d 1013, 1037 (9th Cir. 2012). The en banc opinion expressly states: "The panel opinion, *Veterans for Common Sense v. Shinseki*, 644 F.3d 845 (9th Cir.2011), is hereby VACATED and shall not be cited as precedent by or to any court of the Ninth Circuit." [2] *Id.* It is well established that when an opinion has been vacated, it is as if no opinion was ever entered, and therefore it has no precedential value. *Marley v. U.S.*, 567 F.3d 1030, 1038 (9th Cir. 2009). This is true even if the

---

[2] The en banc opinion in *Veterans for Common Sense v. Shinseki*, 678 F.3d 1013, 1027 (9th Cir. 2012) found that the relevant statutes barred review of the claim, and thus did not reach the standing issue.

decision was vacated "on other grounds" than that for which it is being cited.

*Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 n. 2 (9th Cir.1991).

            3.  <u>The Supreme Court has rejected any theory of "probabilistic standing."</u>

The out-of-circuit cases Plaintiffs rely for standing on are incompatible with more recent Supreme Court authority. *Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1155 (11th Cir. 2008) involved a challenge to a Florida statute which required a person registering to vote for the first time to provide their driver's license number or last four digits of their social security number, and that these must match either the state DMV records, or the Social Security Administration records.

The Eleventh Circuit asserted that plaintiffs could have standing "when the alleged injury was prospective and probabilistic in nature." *Id.* at 1162.  The "probabilistic injuries" alleged in *Browning* were that some people would not be registered to vote in time because of either errors they made themselves on their voter registration application, or because of an error made by a government official, which would cause a non-match with the databases. *Id.*  The court then reasoned: "Given that the NAACP and SVREP collectively claim around 20,000 members state-wide, it is highly unlikely-even with only a one percent chance of rejection for any given individual-that not a single member will have his or her application rejected due to a mismatch." *Id.* at 1163.

16

However, the Supreme Court has since rejected exactly this kind of "probabilistic standing" argument. *Summers*, 555 U.S. at 489-99. The Court explained: "In part because of the difficulty of verifying the facts upon which such probabilistic standing depends, the Court has required plaintiffs claiming an organizational standing to identify members who have suffered the requisite harm…." *Id.* at 499.

*Summers* was decided a year after *Browning*, yet the Court characterized this type of reasoning as "a hitherto unheard-of test for organizational standing: whether, accepting the organization's self-description of the activities of its members, there is a statistical probability that some of those members are threatened with concrete injury." *Id.* at 497. "This novel approach to the law of organizational standing would make a mockery of our prior cases, which have required plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Id.* at 498.

The other case Plaintiffs rely on is *Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004). Like in *Browning*, the Sixth Circuit held in *Blackwell* that the plaintiff-organizations were not required to identify particular members who would suffer harm because the nature of the "mistakes" at issue (e.g., being listed on the voter roll in an incorrect precinct, or the voter showing up at the wrong precinct) could not be predicted in advance, thus no one

17

would know for sure whether he or she would be affected.  *Id.* at 574.
Nevertheless, according to the court, it was "inevitable" that some mistakes would
occur, and someone would be disenfranchised because of the policy regarding
whether to issue or count provisional ballots for voters who are not listed in the
precinct where they show up to vote.  *Id.*

     *Blackwell* is not persuasive authority for several reasons.  First, like
*Browning*, it pre-dates *Summers*, which has now made it abundantly clear that a
plaintiff organization must identify a member who would have standing in their
own right.  Second, *Blackwell* is distinguishable because the claims in that case
were dependent on the occurrence of certain mistakes that the court felt would
"inevitabl[y]" occur, but which could not be predicted in advance in terms of when
they would occur or who they would affect.

     Even assuming that, after *Summers*, such claims could ever meet
associational standing requirements, there are no such circumstances in this case
that would excuse Plaintiffs from identifying particular members who have or will
suffer any harm.  Here, Plaintiffs are seeking declaratory and injunctive relief to
address Defendants' alleged "past and ongoing" violations of the NVRA.  EOR 45.
Specifically, Plaintiffs allege that Defendants failed to always provide a public
assistance client with a voter registration form every time the client applied for or
renewed public assistance benefits, or changed his or her address.  *See* EOR 58-59.

18

Unlike in *Blackwell*, even taking these allegations as true, these events are not unpredictable and are not equally likely to affect any or all members of the NAACP Plaintiffs.[3] They would only affect those members who either are on or who apply for public assistance, and who wish to register to vote or update their registration at the same time. Thus there is no reason why Plaintiffs should not be able to identify one or more such members.

Third, this circuit and the Supreme Court have held that it is necessary to show an identified member would have standing, even in cases where the plaintiff was seeking prospective relief.

For example, in *Associated General Contractors*, the AGC was seeking declaratory and injunctive relief to prevent California from carrying out a race and gender-based affirmative action program for highway contracts. 713 F.3d at 1190. The Ninth Circuit rejected the AGC's contention that it was sufficient to make only general allegations of harm to its members. *Id.* at 1194-95. The court in that case stated: "AGC does not identify any affected members *by name* nor has it submitted declarations by any of its members attesting to harm they have suffered or will suffer under Caltrans' program." *Id.* (emphasis added). In finding a declaration by one of AGC's vice presidents insufficient, the court stated: "In any event, the Ryan

---

[3] Plaintiff La Raza does not appear to contest this point, as it is not a membership organization.

19

declaration does not *name* any specific members of AGC who would be harmed by Caltrans' program." *Id.* at 1195 (emphasis added).

In *Lujan v. Defenders of Wildlife*, the plaintiff environmental protection organizations sought declaratory relief that a regulation promulgated by the Fish and Wildlife Service was invalid, and also sought an injunction requiring the Service to reenact the old version of the regulation. 504 U.S. at 559. The Supreme Court held that the plaintiffs lacked standing because no members established standing. *Id.* at 564. Even though two members were specifically identified, their general statements that they "intended" to travel to observe certain endangered species was not sufficiently actual or imminent to support standing. *Id.* at 563-64.

In *Summers*, the plaintiffs sought declaratory and injunctive relief to prevent the Forest Service taking action under regulations it had adopted that would permit it to conduct salvage timber sales on small parcels burned by wild fire, without the usual notice and public comment procedures. 555 U.S. at 490. The Court held that the plaintiffs lacked standing because the affidavit of a member they submitted failed to identify that he would actually or imminently come into contact with any parcel that was subject to the regulations. *Id.* at 495-96. It specifically rejected the allegations that the member "want[s] to" go to a particular parcel as sufficient for standing purposes. *Id.* at 496.

////

20

Finally, the Court concluded that "[t]his requirement of *naming* the affected members has never been dispensed with in light of statistical probabilities," except in one circumstance, which is where *all* the members of the organization are affected by the challenged activity. *Id.* at 498-99 (emphasis added). As an example of the this type of case, the Court cited *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 459 (1958), which involved a challenge to an order that it release a list of all its members, which obviously would adversely impact all the members, and the very point of the suit was to prevent the disclosure of members' names.

Accordingly, even where the plaintiff-organizations are seeking prospective injunctive relief, they are still required to identify an individual member who would have standing to sue in their own right. This is the crux of associational standing, after all: the organization is purporting to sue *on behalf of its members*. If the organization cannot point to at least one member who individually was or will be imminently harmed, then it is very doubtful that there is in fact any harm that would support standing.

    4.  <u>None of the Plaintiffs adequately alleged associational standing.</u>

The Las Vegas NAACP alleged that it has over 700 members, some of whom have received or will apply to receive public assistance, and who have not registered to vote, or will have moved without updating their voter registration.

21

EOR 49-50.  It also generally alleges that its members have been or will be harmed by not being offered an opportunity to register to vote at a Nevada public assistance office.  EOR 62.  No individual member is identified who allegedly was not or will not be offered an opportunity to register to vote when engaging in a covered transaction at a Nevada public assistance agency.

The Reno NAACP alleged that it has approximately 150-200 members, and also alleged, upon information and belief, that some of them have received or will apply to receive public assistance, and are not registered to vote or will have moved without updating their voter registration.  EOR 50-51.  Like the Las Vegas NAACP, it also generally alleges that its members have been or will be harmed by not being offered an opportunity to register to vote at a Nevada public assistance office.  EOR 64.  It also does not identify any individual members who allegedly were harmed or who would suffer harm.

La Raza asserts that its "constituency" includes people who have or who may receive public assistance.  EOR 49.  However, La Raza does not allege that it has any "members," or that any of them would have standing to sue on their own behalf.  *See* EOR 44-67.  Nor did it identify any individual who is a "constituent" of La Raza.  Finally, unlike the allegations by the NAACP Plaintiffs, the Complaint lacks even a general allegation of any harm to La Raza's "constituents."

22

The District Court therefore correctly held that the NAACP Plaintiffs lack associational standing because they have failed to identify any individual members who would have standing to sue in their own right. *Summers*, 555 U.S. at 498. It also correctly held that La Raza lacked associational standing for the same reason, and also because it does not allege that it even has any members. *See Fund Democracy, LLC v. S.E.C.*, 278 F.3d 21, 25 (D.C. Cir. 2002) (denying associational standing where organization had no members and was not the equivalent of a membership organization).

### III. THE DISTRICT COURT CORRECTLY DISMISSED THE COMPLAINT FOR FAILURE TO COMPLY WITH THE NVRA'S NOTICE REQUIREMENTS.

#### A. The Notice Requirement of the NVRA is Not an Affirmative Defense, Therefore the District Court Did Not Abuse its Discretion by Dismissing For Lack of Notice.

To bring an action under a federal statute, a plaintiff must have not only Article III standing, but statutory standing as well. *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011). Lack of statutory standing will result in the case being dismissed for failure to state a claim pursuant to Rule 12(b)(6). *Id.* As a general matter, it is well-established that a district court may dismiss a complaint *sua sponte* for failure to state a claim. *Weight Watchers Intern., Inc. v. F.T.C.*,

23

47 F.3d 990, 992 (9th Cir. 1995); *Omar v. Sea-Land Service, Inc.*, 813 F.2d 986, 991 (9th Cir. 1987). It may even do so without notice, where it is clear that the plaintiff cannot obtain relief. *Omar*, 813 F.2d at 991.

In this case, the Defendants filed a Motion to Dismiss for failure to give proper pre-suit notice as required by the NVRA. Dkt. No. 22. The Plaintiffs opposed the motion (Dkt. No. 30), and the Defendants replied (Dkt. No. 45). Therefore the Plaintiffs had notice of the issue and in fact responded to it. However, the Motion to Dismiss was withdrawn pursuant to an agreement with Plaintiffs to withdraw their motion for a preliminary injunction.

Plaintiffs assert that withdrawal of the motion to dismiss means that the Defendants waived the notice issue, and by doing so deprived the District Court of authority to rule on that basis. *See* Opening Brief, p. 30. They rely on *Wood v. Milyard*, 132 S.Ct. 1826 (2012), which held that the federal courts should not sua sponte dismiss a habeas corpus petition for lack of timeliness when the state has intentionally waived the statute of limitations defense in order to instead attempt to obtain a ruling on the merits. *Wood*, 132 S.Ct. at 1835.

However, *Wood* is distinguishable. First, the issue in *Wood* was the statute of limitations to bring a habeas corpus petition, which of course is an affirmative defense. *Id.* at 1830. As such, the defendant bears the burden of both pleading the

24

defense and ultimately proving it. *Payan v. Aramark Management Services Ltd. Partnership*, 495 F.3d 1119, 1122-23 (9th Cir. 2007).

As the Ninth Circuit explained in *Thompson v. Runnels*, 705 F.3d 1089, 1099 (9th Cir. 2013), the reasoning in *Wood* applies to affirmative defenses, but not to issues that are elements of the plaintiff's case. In *Thompson*, the court held that *Wood* did not preclude the Ninth Circuit from considering which of two Supreme Court cases was the "clearly established Federal law" at the time the state court decided the petitioner's habeas petition. *Id.* at 1098. The court noted that the habeas petitioner bore the burden of showing that the state court unreasonably applied clearly established Federal law; this was not an affirmative defense to be proved by the defendant, but was part of the plaintiff's case. *Id.* at 1099. Therefore even though the state did not pursue the issue, the court was not precluded by *Wood* from taking it up. *Id.*

Similarly here, the matter of notice under the NVRA is not an affirmative defense, but is instead a mandatory element of standing under that statute. *Georgia State Conference of N.A.A.C.P. v. Kemp*, 841 F.Supp.2d 1320, 1335 (N.D.Ga. 2012); *Broyles v. Texas*, 618 F.Supp.2d 661, 691-92 (S.D.Tex. 2009).

////

////

The NVRA provides in relevant part:

> (b) Private right of action
> (1) A person who is aggrieved by a violation of this subchapter may provide written notice of the violation to the chief election official of the State involved.
> (2) *If the violation is not corrected within 90 days* after receipt of a notice under paragraph (1), or within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office, *the aggrieved person may bring a civil action* in an appropriate district court for declaratory or injunctive relief with respect to the violation.
> (3) *If the violation occurred within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official* of the State under paragraph (1) before bringing a civil action under paragraph (2).

42 U.S.C. § 1973gg-9(b) (emphasis added).

As the courts in *Kemp* and *Broyles* found, the language of the NVRA shows that the notice requirement is mandatory, and it is an element of the plaintiff's statutory standing. "[The NVRA] confers standing on an [sic] party aggrieved only '[i]f the violation is not corrected within 90 days after receipt of a notice under paragraph (1). No standing is therefore conferred if no proper notice is given, since the 90–day period never runs.'" *Kemp*, 841 F.Supp.2d at 1335 (internal citations omitted). In *Broyles*, the court found that "[t]he plaintiffs have not satisfied the requirements under § 1973gg–9 to pursue a private right of action" where the only "notice" they gave to the defendants came in the form of the

26

summons and complaint, and nothing therein indicated a violation that occurred within 30 days of a federal election. *Broyles*, 618 F.Supp.2d at 691-92.

Plaintiffs' reliance on cases addressing exhaustion of administrative remedies under statutes like Title VII or the Prisoner Litigation Reform Act is unavailing in this case. *See* Opening Brief, pp. 31-32. In each of those cases, the exhaustion requirement functioned as an affirmative defense. Here, by contrast, the NVRA itself prohibits the filing of a private action unless: (1) notice is provided (or the violation occurred within 30 days of a federal election); and, (2) the violation remains uncured after the applicable 20 or 90 day period. *Kemp*, 841 F.Supp.2d at 1335; *Broyles*, 618 F.Supp.2d at 691-92.

The notice requirement in this case does not function as a statute of limitations, but instead serves to give the defendant an opportunity to review and correct any deficiencies, and thereby to avoid litigation altogether. *See Association of Community Organizations for Reform Now v. Miller*, 129 F.3d 833, 838 (6th Cir. 1997) (purpose of the NVRA's notice requirements is to allow an opportunity to cure before litigation is filed). This is similar to the notice requirements under the Resource Conservation and Recovery Act, which the Supreme Court held was a bar to filing suit before satisfying those requirements, even without reaching the question of whether notice was "jurisdictional in the strict sense of the term." *Hallstrom v. Tillamook County*, 493 U.S. 20, 31 (1989). As the Court stated: "As a

27

general rule, if an action is barred by the terms of a statute, it must be dismissed." *Id.*

Likewise, the court in *Kemp* held that the individual plaintiff, Murphy, lacked statutory standing and had to be dismissed as a plaintiff because of his failure to comply with the NVRA's notice provisions. 841 F.Supp.2d at 1335-36. Also, the court in *Broyles* dismissed the plaintiffs' NVRA claims, stating: "[t]he plaintiffs have not satisfied the requirements under § 1973gg–9 to pursue a private right of action" because they failed to provide the notice required. 618 F.Supp.2d at 691.

The courts that have specifically addressed the notice provisions of the NVRA have all held that notice is a prerequisite to have statutory standing to bring a private action.  Thus the notice requirement is not an affirmative defense, and *Wood* is inapplicable.  *Thompson*, 705 F.3d at 1099.  The District Court was well within its discretion to review and rule upon the notice issue, especially considering the Plaintiffs were aware of the issue, had a full opportunity to brief it, and in fact did so.

##### B.     ALLEGING A "CONTINUING VIOLATION" IS NOT SUFFICIENT TO DISPENSE WITH THE NVRA'S NOTICE REQUIREMENTS.

Under the NVRA's notice requirements, if the violation occurs within 120 days of an election for federal office, the state has 20 days to cure the violation

from the receipt of the notice. 42 U.S.C. § 1973gg-9(b)(2). If the violation occurs more than 120 days from an election for federal office, the state has 90 days to cure the violation. *Id.* For private lawsuits, the only exception to the notice provision is if the violation occurred within 30 days of an election for federal office. *Broyles*, 618 F.Supp.2d at 692; 42 U.S.C. § 1973gg-9(b)(3).

The District Court correctly held that the Plaintiffs failed to comply with the NVRA's notice requirements because neither the Complaint, nor the Notice Letter identified any violation that occurred within 120 days of a federal election. EOR 13-18.

In this case, Plaintiffs sent a letter dated May 10, 2012 to Secretary Miller and Director Willden (the "Notice Letter"). EOR 69. The letter states that Plaintiffs' "***most recent*** field investigations conducted ***in December 2011***" revealed alleged violations of the NVRA. *Id.* (Emphasis added.) The Notice Letter was also attached to the Complaint as Exhibit A. *Id.*

Similarly, the Complaint alleges that "interviews" conducted in December 2011 showed that not all public assistance clients were given voter registration materials or assistance. EOR 58. The Complaint cites statistics from the Census Bureau and the EAC, but these statistics date to 2010 and earlier. EOR 56-57. In short, nothing in the Notice Letter or the Complaint identifies any particular violation that occurred later than December 2011. In fact, the notice letter

affirmatively states that the Plaintiffs' "most recent" investigations occurred in December 2011. EOR 69.

The Notice Letter states that the Plaintiffs will sue if the alleged violations of the NVRA are not corrected within 20 days.  EOR 71.

Nevada's primary election was held on June 12, 2012, and that election included primary races for federal office.  However, that election was held 164 days from December 31, 2011.  Thus the alleged violations identified in the Notice Letter and the Complaint all occurred more than 120 days before an election for Federal office.  The Defendants were therefore entitled to a statutory period of 90 days from the date of receiving the notice to cure the alleged violations.  42 U.S.C. § 1973gg-9(b).

Plaintiffs' primary argument appears to be that, because they alleged "ongoing" violations of the NVRA, they were not required to give any notice at all. Opening Brief, pp. 33-34.  They argue that no notice was required because the allegation of "ongoing" violations necessarily means that a violation occurred within 30 days of a federal election, thus dispensing with the notice requirement pursuant to 42 U.S.C. § 1973gg-9(b)(3).  Opening Brief, pp. 33-34.

This argument should be rejected for three reasons.  First, as a matter of law, simply alleging that a violation is "ongoing" or "continuous," without actually identifying a discrete violation that occurred within 120 or 30 days of a federal

30

election, is not sufficient to dispense with the notice requirements of the NVRA.

Second, the Plaintiffs' allegations in this case do not plausibly show that Nevada

violated the NVRA within either 120 or 30 days of a federal election.  Third, the

existence of a written policy does not, by itself, excuse failure to comply with the

notice requirement.

> 1.    The plain language of the NVRA requires identification
>        of a particular violation within 120 days of a federal
>        election.

The time to cure, a period of either 20 days or 90 days, depends on when *the*

*violation* occurred, not when the notice was given.  42 U.S.C. § 1973gg-9(b)(2)

provides in relevant part: "If *the violation* is not corrected within 90 days after

receipt of a notice under paragraph (1), or within 20 days after receipt of the notice

if *the violation* occurred within 120 days before the date of an election for Federal

office, the aggrieved person may bring a civil action… for declaratory or injunctive

relief *with respect to the violation*." (emphasis added).

As the District Court noted, 42 U.S.C. § 1973gg-9(b) uses the term

"violation" no less than six times in its three short paragraphs.  EOR 14.  The

NVRA also repeatedly refers to persons "aggrieved," and when violations

"occurred" in the past tense.  *See* 42 U.S.C. § 1973gg-9(b).  The plain language of

the statute therefore requires that, in order to take advantage of the shortened 20

day time to cure, or to dispense with notice requirements altogether, a discrete violation within the applicable time period must be alleged.

Plaintiffs argue that the District Court should have construed their Notice Letter as referring to violations occurring as of the date of the *Letter*, rather than to violations allegedly found during the Plaintiffs' December 2011 field investigation. Opening Brief, p. 34. However, as the District Court correctly concluded, nothing in the Notice Letter itself supports such a reading. The only specific violations referred to in the Notice Letter are those found in the December 2011 field investigation.

Additionally, a reading of the law that would credit the date of the notice, rather than the violation, would turn the NVRA's notice requirements on their head. As discussed above, the amount of time allowed to cure any alleged violation is dependent upon when *the violation* occurred, not when notice is given. As the District Court observed, the Plaintiffs in this case inexplicably waited more than five months (until about a month before the June 12, 2012 primary election) to give notice of the violations they allegedly uncovered in December 2011. Had they given proper notice immediately after discovering the alleged violations in December, 2011, the State would have had ample opportunity to address them well in advance of the June 2012 primary.

32

That would clearly comport with the purpose of the notice requirement, and the NVRA more broadly. By contrast, accepting Plaintiffs' argument that alleging "ongoing violations" in the Notice Letter was sufficient would encourage plaintiffs to withhold notice and wait until less than 30 days before the election to file a lawsuit claiming violations that allegedly occurred many months prior.

Furthermore, Plaintiffs' position that they provided sufficient notice because both the Notice Letter and the Complaint allege "continuing" or "ongoing" violations must be rejected because that construction would render the notice requirements nugatory. Courts should not assume that Congress intended to pass vain or meaningless legislation. *Int'l. Ass'n of Machinists v. BF Goodrich*, 387 F.3d 1046, 1057 (9th Cir. 2004). Nor should statutes be construed in a way that makes their provisions superfluous or meaningless. *United States v. Cabaccang*, 332 F.3d 622, 627 (9th Cir.2003).

Congress would not have bothered to provide for three different levels of notice if a plaintiff could avoid giving any notice at all by just alleging that a violation was "on-going" or "continuous." Nor would it have referred to violations in the past tense. Instead, Congress provided a specific "stepped" approach based on when the violation occurred: the closer to the election, the less time is allowed to cure. This is a sensible and careful approach that appropriately balances the interests of persons who might be aggrieved, while also affording a reasonable

33

opportunity for the state to cure any alleged violations without facing litigation. *See Miller*, 129 F.3d at 838 (purpose of the NVRA's notice requirements is to allow an opportunity to cure before litigation is filed).

Even if a violation is continuous or on-going, that alone provides no reason to excuse compliance with the notice requirements. Even continuing violations may be simply the result of oversight or a misunderstanding of what is required, which may be easily remedied if the defendant is given the chance. By contrast, the only cases where courts have excused non-compliance with the NVRA's notice requirements involve situations where the defendants have affirmatively stated that they will not comply with the NVRA, and have no intention of ever doing so.

For example, in *Miller*, 129 F.3d at 835, Michigan's governor issued an executive order declaring that the state would not comply with the NVRA unless federal funds were made available to do so. Under these circumstances, the Sixth Circuit concluded that giving formal notice, especially where defendants already had actual notice, would be futile. *Id.* at 838.

In *Kemp*, the plaintiffs sent a notice letter dated January 25, 2011, which alleged systemic and ongoing violations as a result of Georgia's policy that it only provided voter registration forms to public assistance clients who applied in person. 841 F.Supp.2d at 1333-34. In that case, the NAACP and other organizational plaintiffs waited more than 90 days to file suit, therefore the timing

34

of filing the complaint was not at issue for those plaintiffs.  *See id.*; *see also*
Complaint (Docket #1) Case No. 1:11–CV–1849–CAP (filed June 6, 2011).

However, the court found one individual plaintiff, Murphy, failed to give
proper notice, and his situation was not made known to the defendants until they
were served with the complaint.  *Id.* at 1335.  Although he alleged that he was not
offered voter registration forms during his contacts with public assistance agencies
(*id.* at 1324), there was nothing alleging that he was a member of, or similarly
situated to the NAACP  or other organizational plaintiffs, or that he was
represented by them, such that the January 25, 2011 letter could be found to have
notified defendants of his situation.  *Id.* at 1335.   The court therefore dismissed
Murphy's claims for lack of proper notice.  *Id.*

Accordingly, whether or not an ongoing violation is alleged, the NVRA
requires that plaintiffs show at least one discrete violation that occurred within the
120-day time period in order to invoke the shorter 20-day period to cure.  *See* 42
U.S.C. § 1973gg-9(b)(2).  This gives effect to all parts of the statute.  It is also
consistent with the NVRA's use of the past tense when referring to violations.  But
most importantly, it carries out the purpose of the notice requirements, which is to
give the defendants a reasonable time to cure the alleged violations before facing
litigation.  *Miller*, 129 F.3d at 838. As the District Court observed, litigation is

expensive for all parties, and the notice requirements are intended to achieve compliance without having to resort to litigation. EOR 11.

Because Plaintiffs do not identify any discrete alleged violation of the NVRA within 120 days or 30 days of a federal election, they have failed, as a matter of law, to comply with the mandatory notice requirements. The Court need go no further in analyzing this issue to affirm the District Court's dismissal.

> 2.    The allegations in this case do not plausibly show that a violation occurred within 120 or 30 days of a federal election.

Should the Court proceed deeper into Plaintiffs' notice arguments, it is apparent that notice was not proper in any event.

At the pleading stage, the plaintiff must allege facts that show it has at least a *plausible* chance of success. *In re Century Aluminum Co. Securities Litigation*, --- F.3d ----, 2013 WL 1633094 (9th Cir. 2013); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). "As *Iqbal* put it, the complaint must allege 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). Facts that only allow an inference of the *possibility* of misconduct are not sufficient. *Iqbal*, 556 U.S. at 679.

Of course, the level of factual detail necessary will vary, depending on the context. *Century Aluminum,* ___F.3d at ____. Conclusory allegations will not

suffice, particularly when experience and common sense indicate that more is necessary in the circumstances of the particular case. *Id.*; *see also Perez v. Nidek Co., Ltd.*, 711 F.3d 1109, 1113 (9th Cir. 2013) ("Such vacuous claims are insufficient to establish standing or to survive a motion to dismiss.").

In this case, the only discrete violations alleged in the Notice Letter or the Complaint occurred in December, 2011. Both the Notice Letter and the Complaint make conclusory statements that Nevada is "systematically failing" to comply with the NVRA or that the violations are ongoing. EOR 69-70; 56. Such statements do not meet the requirements of *Twombly* and *Iqbal*.

Nor does Plaintiffs' reliance on various statistics provide sufficient factual content to draw a reasonable inference that any violation actually occurred within either 120 or 30 days of a federal election. For example, in support of their allegation that there is "widespread ongoing noncompliance with the requirements of Section 7" of the NVRA, Plaintiffs point to 2010 statistics from the U.S. Census Bureau. EOR 56. Specifically, they allege that these data show that only 47.6% of eligible Nevada citizens who live in households earning $25,000 a year or less are registered to vote, compared with 72.4% of eligible citizens living in a household earning $100,000 a year or more. EOR 56. According to Plaintiffs, this "voter registration gap" of 24.8% "strongly suggests" that Nevada is not complying with the NVRA. EOR 56.

However, the figures Plaintiffs rely on for Nevada are similar to the "voter registration gap" that exists nationally. For 2010, Census Bureau data show that for households earning $20,000 or less, the percent registered is 58.1%, and for households earning more than $100,000 is 79.9%, a "voter registration gap" of 21.8%. Thus there is less than a 3% difference between Nevada and the national average. See Table 7, Reported Voting and Registration of Family Members, by Age and Family Income: November 2010, available at:

http://www.census.gov/hhes/www/socdemo/voting/publications/p20/2010/tables.html).[4]

The mere fact that a lower percentage of people living in low-income households are registered to vote than the percentage of people living in high-income households cannot lead to the inference that it is plausible that Nevada violated Section 7 of the NVRA within 120 or 30 days of a federal election. There are a great number of reasons that could explain this gap in registration, other than violations of the NVRA: education, social status, community involvement, etc.

---

[4] This Court may take judicial notice of these data because they are of the same source and type as data submitted by the Plaintiffs, and they meet the requirements of Fed.R.Evid. 201(b). *U.S. v. Esquivel*, 88 F.3d 722, 726-27 (9th Cir. 1996). Also, these data were presented to the District Court in Defendants' opposition to Plaintiffs' motion for preliminary injunction, so they are not being presented here for the first time. *See* EOR 30 (Order, discussing Census data).

Plaintiffs also heavily rely on Election Assistance Commission survey data. EOR 56-57. The Complaint alleges that the number of voter applications received from public assistance agencies in Nevada was:

| Year | Registration forms from a Public Assistance Agency |
|------|-----------------------------------------------------|
| 1995-1996 | 13,200 |
| 1997-1998 | No report |
| 1999-2000 | 2,883 |
| 2001-2002 | 39,444 |
| 2003-2004 | 6,389 |
| 2005-2006 | 3,307 |
| 2007-2008 | 4,301 |
| 2009-2010 | 1,677 |

EOR 57.

Plaintiffs claim that this table shows a "95.7 percent decline" in the number of voter applications received by the county clerks from public assistance agencies. EOR 56. However, these numbers do not support Plaintiffs' claims either. First, this table shows that the figure of 39,444 is greater, by an order of magnitude, than nearly any other numbers reported by Nevada. This strongly suggests that the figure of 39,444 is simply a clerical error.

Even if 39,444 were an accurate figure for the 2001-2002 election cycle, it remains such a significant outlier that, on its face, it is unreasonable to assume that it is reflective solely of Nevada's compliance with the NVRA. In other words, it simply does not make sense to conclude that for the 2001-2002 election cycle, and

39

*only* that cycle, Nevada fully implemented Section 7, but failed to do so either before or after, and therefore that is the only cause of the difference in the numbers reported to the EAC.  Furthermore, all the statistics were from 2010 and earlier – about two years prior to the June 2012 election.

This case is similar to the situation in *In re Century Aluminum Co. Securities Litigation*, --- F.3d ----, 2013 WL 1633094 (9th Cir. 2013).  In that case, the court held that the plaintiffs failed to allege statutory standing under Section 11 of the Securities Act of 1933 because they failed to allege facts showing it was plausible that the shares they bought were traceable back to the second offering, which was made using allegedly material misrepresentations in the registration statement. *Id.* at *2.  The court rejected the argument that the allegation that plaintiffs "purchased Century Aluminum common stock directly traceable to the Company's Secondary Offering" was sufficient.  *Id*.  Citing *Twombly* and *Iqbal*, the court found that, because the company had issued stock in multiple offerings, plaintiffs were required to allege some facts indicating that it was plausible that their shares in fact came from the second offering.  *Id.*

The plaintiffs in *Century Aluminum* argued that they had sufficiently alleged such facts by alleging the dates of their stock prices, and the significant price fluctuations at the same time, which they alleged as a result of the market being flooded with shares purchased by underwriters in the second offering.  *Id.* at *3.

The court noted that, although these facts may be *consistent* with plaintiffs' theory, they did not tend to disprove the "obvious alternative explanation," which was that the shares were traceable to a previous offering. *Id.*

"When faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation." *Id.* (quoting *Iqbal*, 556 U.S. at 678). "Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true…" *Id.*

Here, the District Court correctly held that while these statistics may be *consistent* with the theory that Nevada was not complying with the NVRA, they do not allow any reasonable inference that it was *plausible* that Nevada is not in compliance with the NVRA, let alone specifically that it violated the NVRA within 120 days of the June 2012 primary election. There are simply far too many other circumstances that could just as easily account for these statistics. Thus, like in *Century Aluminum*, these alleged facts do not suffice because they do not tend to exclude the numerous alternative explanations, such as poor or inaccurate record keeping, or, as the District Court posited, Plaintiffs' own asserted success at registering low-income voters during their numerous voter registration drives. EOR 17.

The purpose of the rule in *Twombly* and *Iqbal* is to protect defendants from being unfairly put to the enormous expense of discovery on only general assertions of harm. *Starr v. Baca*, 652 F.3d 1202, 1212, 1216 (9th Cir. 2011). This purpose is especially relevant to the NVRA's notice requirements in this case. The obvious purpose of dispensing with notice requirements if a violation occurs within 30 days of a federal election is so that an aggrieved individual can challenge the action and get registered in time to vote in the upcoming election.

Of course, the Plaintiffs in this case are not individuals and do not have a right to vote. Thus they can only be "aggrieved" under the NVRA if they divert more than some nominal amount of resources to combatting the State's alleged noncompliance, or if they identify a particular member who would have standing. If that is in fact the case, Plaintiffs should be able to allege facts indicating that a violation occurred within 30 days before a federal election. Plaintiffs cannot be permitted to dispense with notice altogether by simply relying on years-old statistics which do not themselves purport to indicate any correlation, let alone causation, between compliance with the NVRA and the number of voters registered.

This would unfairly subject Defendants to expensive, burdensome discovery without any plausible showing of a violation. It is also directly contrary to both the plain language and purpose of the NVRA's notice requirements, which is to

provide a mechanism for ensuring compliance without the time and expense of litigation.

>   3.   The existence of a policy that allegedly violates the
>        NVRA does not excuse failure to comply with the
>        notice requirements.

Plaintiffs next argue that they sufficiently alleged "on-going" violations, and therefore a violation within 30 days of a federal election, because Nevada's policy was to only give voter registration forms to those clients who marked "yes" on the form in response to the question of whether they wanted to register to vote. Opening Brief, p. 36.

The NVRA requires public assistance agencies to provide voter registration forms to all clients who engage in a covered transaction[5] "unless the applicant, *in writing*, declines to register to vote." 42 U.S.C. § 1973gg-5(a)(6)(A) (emphasis added). The NVRA requires the following question, verbatim, to be printed on a "voter preference form"[6] that must be given to clients: "If you are not registered to vote where you live now, would you like to apply to register to vote here today?" 42 U.S.C. § 1973gg-5(a)(6)(B)(i). The form must also contain a "yes" box and a "no" box to be checked by the client. 42 U.S.C. § 1973gg-5(a)(6)(B)(iii).

---

[5] Covered transactions are: applying for public assistance, renewing or recertifying for benefits, or a change of address. 42 U.S.C. § 1973gg-5(a)(6)(A).

[6] Nothing in the NVRA requires public assistance workers to verbally ask clients whether they want to register to vote. *Cf.* EOR 58 (suggesting that failing to ask is a violation of the NVRA).

Next to this question and the "yes" and "no" boxes, the NVRA also requires the statement: "IF YOU DO NOT CHECK EITHER BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED NOT TO REGISTER TO VOTE AT THIS TIME." 42 U.S.C. § 1973gg-5(a)(6)(B)(iii).

The gist of Plaintiffs' argument is that the NVRA requires Nevada to give registration forms to clients who do not check either box, and thus leave the voter preference form blank. The theory is that a client who fails to check either box has not declined to register "in writing," and therefore it is a violation of the NVRA if the client is not given a voter registration form.

On February 21, 2012, the Tenth Circuit adopted this theory in *Valdez v. Squier*, 676 F.3d 935, 947 (10th Cir. 2012). Thus Plaintiffs argue that the fact that Nevada's policy was to only give voter registration forms to clients who checked "yes" on the form is evidence of a continuing violation that must have occurred within 30 days of a federal election.

This argument should be rejected because dispensing with notice under these circumstances would be contrary to the plain language of the NVRA and would frustrate the purpose of the notice requirements.

The *Valdez* case was decided shortly before the Plaintiffs sent their Notice Letter in May, 2012. To date, it appears that the Tenth Circuit is the only circuit court to have adopted this theory, and of course its holding is not binding on

44

Nevada or this Court.  Furthermore, the Tenth Circuit's conclusion is counterintuitive, to say the least, in light of the NVRA's mandatory statement that: "If you do not check either box, you will be considered to have decided not to register to vote at this time."  42 U.S.C. § 1973gg-5(a)(6)(B)(iii).

Particularly under such circumstances, it would make no sense to excuse Plaintiffs' failure to give proper notice.  Notice and a chance to cure would have given Defendants an opportunity to review the recent case, review their existing policies, and to change the policies.  That would quickly resolve any alleged violation of the NVRA, without the time, expense and burden of litigation.  This is exactly the purpose of the notice requirements of the NVRA.  By contrast, accepting Plaintiffs' arguments that the mere existence of a policy that allegedly violates the NVRA excuses them from giving notice would make the notice requirements meaningless.

In sum, the District Court correctly found that Plaintiffs lacked statutory standing under the NVRA because they failed to wait more than 90 days after sending their Notice Letter before filing suit.  The NVRA requires a 90-day period to cure, unless a violation occurred within 120 days of a federal election.  As a matter of law, the NVRA requires that the plaintiff identify a particular violation that occurred within 120 days of a federal election in order to take advantage of the shorter time-to-cure period, and merely alleging a continuing violation is

45

insufficient. Since nothing in the Notice Letter or the Complaint identified any violation that occurred within 120 days of a federal election, the Plaintiffs were obligated to give the State at least 90 days to cure the alleged violations. Having failed to do so, the District Court properly dismissed for lack of statutory standing.

## IV.   THE DISTRICT COURT CORRECTLY DISMISSED THE COMPLAINT WITH PREJUDICE.

"Dismissal without leave to amend is improper unless it is clear, upon *de novo* review, that the complaint could not be saved by any amendment." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1034 (9th Cir. 2008). The decision whether to grant leave to amend is within the discretion of the district court. *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008).

Leave to amend may be denied where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Id.* (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Failure of the district court to explicitly state its reason for refusing leave to amend is not an abuse of discretion if the record demonstrates that any amendment would be futile. *Thinket Ink Information Resources, Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1061 (9th Cir. 2004).

46

Even if Plaintiffs could have cured the problems with Article III standing, the District Court nevertheless correctly dismissed the Complaint with prejudice because no amendment could have cured Plaintiffs' lack of statutory standing.

As discussed above, the NVRA requires notice of the violation to be given *before* the complaint is filed. *Kemp*, 841 F.Supp.2d at 1335; *Broyles*, 618 F.Supp.2d at 691.  Thus no amendment could be properly brought to cure the deficiencies in Plaintiffs' statutory standing, because any such amendment would necessarily be for violations of which the Defendants have not received the required notice.

## V.     REASSIGNMENT ON REMAND IS NOT PROPER

For the foregoing reasons, this Court should affirm the District Court's dismissal, therefore rendering the request for reassignment moot.  But if a remand is ordered, reassignment is not warranted here.

The authority to reassign a case to a different judge on remand is reserved for "rare and extraordinary circumstances."  *United Nat. Ins. Co. v. R&D Latex Corp.*, 242 F.3d 1102, 1118 (9th Cir. 2001) (quoting *Air-Sea Forwarders, Inc. v. Air Asia Co., Ltd.*, 880 F.2d 176, 191 (9th Cir.1989)).  Reassignment requires a substantial showing that it is necessary to preserve the appearance of justice.  *See U.S. v. Sears, Roebuck & Co., Inc.*, 785 F.2d 777, 780 (9th Cir. 1986). Reassignment is proper only where there is either personal bias of the district

47

judge, or there are "unusual circumstances." *R&D Latex Corp.*, 242 F.3d at 1118. Here, Plaintiffs claim that there is both personal bias and unusual circumstances.

## A.     THERE IS NO EVIDENCE OF PERSONAL BIAS.

Reassignment for personal bias is only appropriate if the district judge exhibits personal bias that would require recusal. *Id.*; *U.S. v. Mancinas-Flores*, 588 F.3d 677, 686 (9th Cir. 2009). The standard for recusal is: "[w]hether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *U.S. v. McTiernan*, 695 F.3d 882, 891 (9th Cir. 2012).

Bias that is grounds for recusal exists "only if it is an attitude or state of mind that belies an aversion or hostility of a kind or degree that a fair-minded person could not entirely set aside when judging certain persons or causes." *Matter of Yagman*, 796 F.2d 1165, 1182 (9th Cir. 1986) (quoting *United States v. Conforte*, 624 F.2d 869, 881 (9th Cir. 1980). Of course, "a judge's prior adverse ruling is not sufficient cause for recusal." *Taylor v. Regents of Univ. of Cal.*, 993 F.2d 710, 712 (9th Cir.1993).

In this case, there is no evidence of personal bias. For example, there is no evidence that the District Judge has any personal stake in the outcome of this case, that he has any confidential knowledge about any of the parties, claims, or issues, or otherwise would be required to recuse himself. *See* 28 U.S.C.A. § 455 (setting

48

forth various grounds for disqualification). Instead, Plaintiffs allege bias based on: the scheduling of the preliminary injunction hearing, certain comments the District Judge made during a hearing and in its Order, and the fact that the District Court ruled against them sua sponte on standing. None of these are sufficient evidence of bias to warrant reassignment.

There is no indication that the scheduling of the preliminary injunction hearing after the close of voter registration was in any way motivated by personal bias, rather than simply the court's crowded docket. This Court rejected similar speculation of bias in *Yagman*, 796 F.2d at 1179-80, where there was no evidence that the judge rescheduled a case to intentionally create a conflict with the attorney's scheduled testimony in another matter. Here, the District Court did move the hearing date from October to September 18, at the parties' request, but counsel for neither party was available that day. Thus the hearing date was moved back to the original October date. This demonstrates that the District Court attempted to accommodate the Plaintiffs. Also, because Plaintiffs waited until July to file their motion for a preliminary injunction, when they knew of the alleged violations since December, they have no room to complain that their case was not heard immediately.

Nor is there any indication that the denial of some of Plaintiffs' *pro hac vice* applications indicated bias. Plaintiffs had submitted eight *pro hac vice*

49

applications for lawyers from four different law firms. *See* Docket Nos. 35, 36, 39-44. In denying some of those motions, the District Court correctly stated that, although Plaintiffs are entitled to counsel of their choosing, they are not necessarily entitled to have as many out-of-state lawyers as they want. EOR 38.

The District Court did indicate that it was concerned that these lawyers were representing the interests of their own firms, more so than the Plaintiffs. EOR 38. Nevertheless, it stated that it would grant two *pro hac vice* applications, and asked the Plaintiffs to indicate which ones it preferred. EOR 38. The District Court also clarified that just because it was not granting all of the applications did not mean that those lawyers could not participate in research, writing the briefs, etc. EOR 40.

Plaintiffs' counsel indicated concern with having associates who were not admitted *pro hac vice* take depositions in Nevada. EOR 42. In response, the District Court stated:

> I think your notation is correct, and we have a very limited -- maybe you should be filing a lawsuit against our State Bar rule and rule of the court. It is pretty restrictive.
>
> I, myself, tend towards libertarianism. I would not have such a rule if it were up to me. I wouldn't even require that they be a member of the State Bar, but that is the rule, and it is restrictive, and I am going to enforce it.

EOR 42-43.

This statement indicates that the District Court did not have any personal bias against Plaintiffs or their attorneys, but instead felt that it was enforcing the State Bar's *pro hac vice* rules.

Plaintiffs filed a motion to reconsider the *pro hac vice* decision, and the District Court did not rule on it. However, it cannot be fairly said that the District Court "ignored" the motion to reconsider out of bias; instead, it simply became moot because of the court's order on standing.

Next, Plaintiffs argue that the court's sua sponte dismissal of the complaint demonstrates bias. However, as discussed above, federal courts not only may, but are obligated to, raise the question of Article III standing on their own motion. Additionally, federal courts may also sua sponte dismiss for failure to state a claim. Therefore this alone also fails to demonstrate bias. *See Taylor*, 993 F.2d at 712 ("a judge's prior adverse ruling is not sufficient cause for recusal.").

Finally, this case is a far cry from the cases Plaintiffs cite in their brief for the proposition that reassignment is proper "in precisely these situations." *See* Opening Brief, p. 49. In *United States v. Jacobs*, 855 F.2d 652, 656–57 (9th Cir. 1988), the dismissal of the indictment "summarily and erroneously" was just the culmination of a string of overtly biased behavior. For example, concerning the offering of an incomplete document into evidence, the court berated the prosecutor, even though defense counsel admitted it was his mistake. *Id.* at 654. The court

explicitly told defense counsel that it thought they would win, and even gave advice on how to win the case. *Id.* The court made derogatory statements about the government's counsel, such as: "Every U.S. Attorney that appears in my court [relies] on somebody else to do [his] work." *Id.* The court berated the prosecutor in front of the jury. *Id.* And the court dismissed the indictment and refused to reconsider the dismissal, even though the mistake was pointed out only two minutes later. *Id.* at 656.

In *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1034 (9th Cir. 2012), the court ordered reassignment based on the "unusual circumstances" test, not on bias grounds. This test is discussed below. However, this case too is distinguishable on the bias analysis. There, the district judge made forceful statements that "the case was 'unnecessary,' a 'waste of time,' 'not worth a dime,' and 'should never have been filed.'" *Id.* Similar comments were made by the judge in *Mitchell v. Maynard*, 80 F.3d 1433, 1449 (10th Cir. 1996).

Here, however, there are no such statements by the District Court. In this case, the District Court's statements are not "inflammatory," nor are they similar to the statements in *Evon* and *Mitchell*, where the courts each clearly stated that it believed the cases to be entirely worthless. None of the statements in the District Court's order or during the hearing on the *pro hac vice* motions in this case provide any evidence sufficient to demonstrate personal bias, i.e., an "aversion or hostility"

52

of such a degree that a fair-minded person could not set it aside when making a

judgment.  *See Yagman*, 796 F.2d at 1182.

## B.    NO "UNUSUAL CIRCUMSTANCES" EXIST WARRANTING REASSIGNMENT.

In the absence of personal bias, reassignment is proper only in exceedingly

rare circumstances. *Yagman*, 796 F.2d at 1188.  The following factors are

considered:

> (1) whether the original judge would reasonably be
> expected upon remand to have substantial difficulty in
> putting out of his or her mind previously-expressed views
> or findings determined to be erroneous or based on
> evidence that must be rejected, (2) whether reassignment
> is advisable to preserve the appearance of justice, and (3)
> whether reassignment would entail waste and duplication
> out of proportion to any gain in preserving the
> appearance of fairness.

*Sears*, 785 F.2d at 780.

A finding of either of the first two factors would support a remand to a

different judge. *Id.*

In *Sears*, the court found that the first factor was met (as was the second),

because the district judge dismissed the indictment *three times*, even after being

repeatedly reversed by the Ninth Circuit. 785 F.2d at 781.  Also, the district judge

had made emphatic comments clearly showing that he would be unable to change

his mind on the issue:

////

> I think this is one of the most egregious cases I
> have ever, ever known about in my career as a lawyer. I
> think ... if I had been the United States Attorney at that
> time, I would have fired [the original prosecutor] on the
> spot
> ....
> Obviously the Department of Justice didn't listen to [my
> prior opinion dismissing this case]; didn't read it as such
> ... to put [the original prosecutor] on other cases after
> that.

*Id.*

Similar comments followed the district judge's third dismissal of the indictment: "[t]he conduct ... of the government in this case has been outrageous from the beginning and it has not ceased. It has not ceased." *Id.*

Here, by contrast, the District Court never made any such comments indicating that it was so adamant in any of its holdings that it would be unable to put them out of mind.

Nor are the circumstances such that it is necessary to reassign the case to preserve the appearance of justice. Plaintiffs point to three statements that they characterize as "inflammatory." Opening Brief, pp. 50-51. However, none of these rise to even remotely the same level as the comments in cases like *Sears*.

The "ulterior motive" and "tactic of delaying" statements were both made in connection with discussing the fact that Plaintiffs inexplicably waited more than five months to give notice of the alleged violations discovered in December, 2011, and the Complaint was not filed until more than six months had elapsed. As the

District Court correctly observed, the record is and was devoid of any explanation for this delay, which seems contrary to the Plaintiffs' professed urgency in correcting the alleged "ongoing" violations of the NVRA. EOR 13.

Furthermore, these statements were made in passing in the course of a multi-page discussion of Plaintiffs' notice argument. They do not indicate that the District Court in fact *found* that the Plaintiffs had some unlawful ulterior motive, or deliberately engaged in unjust delay, or that the court would be unable to put out of mind any such sentiments, should this Court rule otherwise and remand.

Similarly, the reference that the Plaintiffs "hastily scrambled three witnesses" to support their assertion that the alleged violations were continuous does not demonstrate any adamant finding on a matter of any consequence to this case. Each of the affidavits in questions was dated either June 19 or 20, 2012, after the Complaint and Defendants' motion to dismiss were filed, but before the preliminary injunction motion was filed. This statement merely reflects the court's familiarity with the oft-unspoken reality of litigation: after Defendants filed their motion to dismiss for lack of proper notice, Plaintiffs decided to respond by quickly gathering evidence to support their contentions that the violations were "ongoing."

None of these statements give rise to the rare circumstances where reassignment is warranted. This is in contrast to *Sears*, where the district judge

55

adamantly and explicitly stated that the case was "the most egregious… that [he] had ever seen," that he would have fired the prosecutor on the spot, and that the government's conduct was "outrageous from the beginning and it has not ceased." *Sears*, 785 F.2d at 781.

In *Air-Sea Forwarders, Inc. v. Air Asia Co., Ltd.*, 880 F.2d 176, 191 (9th Cir. 1989), this Court found that reassignment was not warranted, even where the district judge had expressed strong views regarding the credibility of certain witnesses.  For example, the judge characterized the testimony as "wholly devoid of credibility," "simply ridiculous," and "wholly incredible."  *Id.* at 191. Nevertheless, the court found that the case "bears no resemblance to the *Sears* case" and denied the request for reassignment.  *Id.*  In *Glen Holly Entertainment, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 382 (9th Cir. 2003), the court found that the judge's remark that he would not hire another law clerk from Yale did not indicate personal bias against the law clerk's work in that case, nor warrant reassignment.

This case is similar to *Air-Sea* and *Glen Holly*. None of the District Court's statements in the course of its nearly thirty page order indicate the type of adamant beliefs or prejudice that would threaten the appearance of justice or indicate that the District Court could not fairly handle this case if there were a remand.  This is not one of the exceedingly rare cases where reassignment is warranted.

////

56

# VI.

# CONCLUSION

For the foregoing reasons, this Court should AFFIRM the district court's order in its entirety. In the alternative, if this Court remands the case to allow leave to amend, it should deny the Plaintiffs' request for reassignment and the case should be remanded with instructions that the dismissal shall be entered without prejudice.

Respectfully submitted this 20th day of June, 2013.

CATHERINE CORTEZ MASTO
Attorney General

By:   /s/ Kevin Benson
          KEVIN BENSON
          Senior Deputy Attorney General
          100 North Carson Street
          Carson City, Nevada 89701
          (774) 684-1114
          Attorney for Defendants-Appellees,
          ROSS MILLER, Nevada Secretary
          of State, and MICHAEL WILLDEN,
          Director of the Department of Health
          and Human Services

## <u>STATEMENT OF RELATED CASES</u>

The undersigned asserts that to the best of his knowledge, there are no other

related cases pending in the Ninth Circuit Court of Appeals.

Respectfully submitted this 20th day of June, 2013.

<div style="margin-left: 40%;">

CATHERINE CORTEZ MASTO
Attorney General

By:    /s/ Kevin Benson
        KEVIN BENSON
        Senior Deputy Attorney General
        100 North Carson Street
        Carson City, Nevada 89701
        (774) 684-1114
        Attorney for Defendants-Appellees,
        ROSS MILLER, Nevada Secretary
        of State, and MICHAEL WILLDEN,
        Director of the Department of Health
        and Human Services

</div>

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Ninth Circuit Rule 32(a)(7), I certify that the attached

Defendants'/Appellees' Answering Brief is proportionately spaced, has a typeface

of 14 points or more and contains 13,120 words.

Respectfully submitted this 20th day of June, 2013.

> CATHERINE CORTEZ MASTO
> Attorney General
>
> By:   /s/ Kevin Benson
> KEVIN BENSON
> Senior Deputy Attorney General
> 100 North Carson Street
> Carson City, Nevada 89701
> (774) 684-1114
> Attorney for Defendant-Appellant,
> ROSS MILLER, Nevada Secretary
> of State, and MICHAEL WILLDEN,
> Director of the Department of Health
> and Human Services

59

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 20, 2013.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Sarah Brannon
Project Vote
1350 Eye Street NW
Washington, DC 20005

David Rubino
DEMOS
220 Fifth Avenue, 2nd Floor
New York, NY 10001

Alan A. Martinson
Lawyers Committee for
Civil Rights Under Law
1401 New York Avenue NW
Washington, DC 20005

Neil S. Steiner
Dechert, LLP
1095 Avenue of the Americas
New York, NY 10036-6797

_____/s/ Linda Deming_____
An employee of the State of Nevada
Office of the Attorney General

60